IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE



**Thomas M. Horan**

**United States
Bankruptcy Judge**

824 N. Market Street
Wilmington, Delaware
(302) 252-2888

October 22, 2025

**VIA CM/ECF**

William E. Chipman, Jr.
Mark D. Olivere
Chipman Brown Cicero & Cole, LLP
Hercules Plaza
1313 North Market Street, Suite 5400
Wilmington, DE 19801

Christopher M. Samis
L. Katherine Good
Maria Kotsiras
Potter Anderson & Corroon LLP
1313 N. Market Street, 6th Floor
Wilmington, DE 19801

Ryan Blaine Bennett, P.C.
Peter A. Candel
Kirkland & Ellis LLP
Kirkland & Ellis International LLP
333 West Wolf Point Plaza
Chicago, IL 60654

Damien Nicholas Tancredi
Flaster/Greenberg, P.C.
221 W. 10th Street, Fourth Floor
Wilmington, DE 19801

Re: *In re The Pet Apothecary LLC,* No. 24-11192

Dear Counsel:

On August 5, 2025, I held a status conference regarding the Statement of the Ad Hoc Group of Mezz Lenders Regarding Intercreditor and Subordination Rights Under the Plan [Case No. 24-11188, D.I. 807, Ex. 1], the Ad Hoc Group of Mezz Lenders' Notice of Statement of Claim [D.I. 807], and Certain Seller Noteholders Response [Case No. 24-11188, D.I. 847].

The Ad Hoc Group (also sometimes referred to in the parties' papers and this letter as Aves) requested that this court direct that any distributions made to Class

8 creditors under the Second Amended Joint Chapter 11 Plan of Reorganization[1] go to the administrative agent under the Note Purchase Agreement. In the alternative, the Ad Hoc Group requests that this court order certain plan modifications. The Seller Noteholders (as hereinafter defined) object to the relief requested by the Ad Hoc Group.

For the reasons set forth below, I am denying Aves' request and directing the Escrow Account's funds be distributed to the Seller Noteholders as dictated by the Plan.

My discussion of the factual background is brief because I write primarily for the parties.

**Factual Background**

Baybridge Pharmacy Corp, 121 Central Pharmacy Corp., and Delco Pharmacy Corp. and PIA Holdings, Inc (hereinafter, the "Seller Noteholders") are each former owners of pharmacies that sold their business to Optio Rx in exchange for notes issued from Optio Rx back to the sellers.

The Ad Hoc Group comprises all noteholders within Class 7 of the Plan. In connection with the Debtors' issuance of certain notes to the Ad Hoc Group (hereinafter, the "Ad Hoc Group's Notes") pursuant to the Note Purchase Agreement, dated September 25, 2020, Optio Rx and each Seller Noteholder agreed to amend and restate each Seller Note to include subordination provisions that provide the Seller Notes are subordinated to the Ad Hoc Group's Notes.[2] The Seller Notes contain the following pertinent clauses:

> **Section 8(b) Subordination to Senior Debt.** Notwithstanding anything in this Note or the Purchase Agreement to the contrary, the Seller hereby agrees and covenants that, to the extent set forth herein and, on the terms, and conditions set forth herein, the Subordinated Debt is and shall be subordinate in right of order and payment to the principal in full of the Senior Debt. Each holder of Senior Debt, either now existing or hereafter arising, shall be deemed to have acquired such Senior Debt in reliance upon the provisions contained in this Section 8 . . .

---

[1] Second Amended Joint Chapter 11 Plan, Case No. 24-11188, D.I. 480.
[2] The subordination provision is identical in each Seller Note aside from the section number of the provision and the defined term for the Seller Noteholders and the applicable Debtors. Statement of the Ad Hoc Group of Mezz Lenders Regarding Intercreditor and Subordination Rights Under the Plan, Case No. 24-11188, D.I. 807, Ex. 1, ¶ 1.

**(d) Subordination upon Dissolution, Liquidation or Reorganization of Buyer Parties**. *Upon any distribution by Buyer Parties of assets of any kind or character*, whether in cash, property or securities, to creditors upon any dissolution, winding up, liquidation or reorganization of Buyer Parties, whether in a voluntary or involuntary bankruptcy, insolvency or receivership proceedings or upon any assignment for the benefit of creditors or otherwise or any other marshalling of assets and liabilities of Buyer Parties . . . [continues to discuss an allocation scheme.]

> (i) The Administrative Agents and the Lenders shall first receive payment in full in cash of all Senior Debt . . . before the Seller is entitled to receive any Subordinated Payment on account of or accrued or incurred in connection with any Subordinated Debt.
>
> (ii) Any payment or distribution of assets of the Buyer Parties of any kind or character . . . to which the Seller would be entitled except for the provisions of this Section 8 shall be paid by the Buyer Parties . . . or other person making such a payment or distribution, directly to, until the termination of, and the satisfaction in full of all obligations . . . to the Senior Debt in accordance with the terms of any applicable intercreditor agreements between the Administrative Agents to the extent necessary to make payment in full of all Senior Debt remaining unpaid; and
>
> (iii) In the event that, notwithstanding the foregoing, any payment or distribution of assets of the Buyer Parties of any kind or character, whether in cash, property or securities, shall be received by the Seller on account of, or accrued or incurred in connection with, any Subordinated Debt before all Senior Debt is paid in full in cash, then such payment or distribution shall be received and held in trust for the benefit of and shall be promptly paid over to, until the termination of, and the satisfaction in full of all obligations . . . in accordance with the terms of any applicable intercreditor agreements between the Administrative Agents until all Senior Debt shall have been paid in full. For the avoidance of doubt, the foregoing only applies upon any distribution by the Buyer Parties of assets of any kind or character . . . to creditors upon any dissolution, winding up, liquidation or reorganization of the Buyer Parties, whether in a voluntary or involuntary bankruptcy, insolvency or receivership proceedings or upon any assignment for the benefit of creditors or otherwise or any other marshalling of assets and liabilities of the Buyer Parties.[3]

---

[3] Ad Hoc Group Statement, Ex. B, pp. 14-15 (hereinafter, the "Baybridge Seller Note") (emphasis added).

On June 29, 2024, Aves and Optio Rx entered into a Settlement Term Sheet.[4] The Settlement Term Sheet provides that "[a]t Emergence (x) Aves and each Holder will opt into (and shall not opt out of) any proposed third-party releases under the Plan of Reorganization and (y) Aves and each Holder, on the one hand, and the Prepetition Secured Lenders and agent and the DIP lenders and agent, on the other hand, will enter into mutually acceptable mutual releases."[5]

On October 17, 2024, the Plan was confirmed[6]. It went effective on March 21, 2025.[7] Under the Plan, Class 8, which consists of seller notes claims including the Seller Noteholders, "shall receive, by virtue of the *gift funding* the UCC Settlement Amount under the UCC Settlement Agreement, their respective pro rata share of the UCC Settlement Amount among the Holders of Allowed Claims Treated under Classes 6 and 8 of the Plan."[8] The UCC Settlement Agreement is the "settlement among the Debtors, the Committee, the Prepetition Admin Agency and the DIP Agent resolving all Challenges, whether or not alleged by the Committee or any other party, to the Prepetition Lien Claims and Prepetition Liens and the DIP Lien Claims and DIP Liens . . . in consideration for funding of a gift . . . on the Effective Date of the UCC Settlement Amount [$275,000] . . . for the ratable benefit of Holders of Allowed Claims in Classes 6 and 8 to be distributed on a pro rata basis."[9]

The Plan provides that "the allowance, classification and treatment of all Allowed Claims and Allowed Interests and the respective distributions and treatments under the Plan take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code or otherwise."[10] Lastly, Section 4.10 of the Plan permits Aves to file a statement of claim within 14 days of the Effective Date, which it did on March 25, 2025.[11]

On the effective date of the Plan, the Debtors were to fund the UCC Settlement Amount into escrow with Flagstar Bank in accordance with Section 4.10(b) of the Plan in the amount of $275,000 (the "Escrow Account").[12] This money is to be distributed in three parts: (i) one to general unsecured claimants; (ii) one to

---

[4] Disclosure Statement Relating to the Amended Joint Chapter 11 Plan of Reorganization of Optio Rx, LLC, Case No. 24-11188, D.I.258, Ex. E (hereinafter, the "Aves Settlement Agreement").
[5] Aves Settlement Agreement, p. 216.
[6] Second Amended Joint Chapter 11 Plan.
[7] Notice of Effective Date, Case No. 24-11188, D.I. 797.
[8] Second Amended Joint Chapter 11 Plan, pp. 26, ¶ 3.04(h) (emphasis added).
[9] Second Amended Joint Chapter 11 Plan, pp. 15-16.
[10] Second Amended Joint Chapter 11 Plan, pp. 29, ¶ 3.10.
[11] Second Amended Joint Chapter 11 Plan, pp. 33, ¶ 4.10(b)(ii).
[12] Notice of Effective Date, Case No. 24-11188, D.I. 797.

Aves and Seller Noteholders, to which the Seller Noteholders did not object, making Aves entitled to this distribution; and (iii) the current disputed piece directed to the Seller Noteholders, worth $165,000 of the $275,000 Escrow Account.[13]

Aves is requesting two forms of relief. First, Aves requests the court direct that any distributions on account of Class 8 go directly to the administrative agent under the Note Purchase Agreement. Second, in the alternative, Aves requests the Plan be modified to add additional language[14] providing that the Plan and the Confirmation Order do not validate or create any specific rights for a creditor regarding a distribution.

The absolute priority rule is the governing principle for ensuring a fair and equitable distribution amongst claim holders. Under the absolute priority rule, if a class of senior claimholders will not receive the full value of their claim under the plan and the class does not accept the plan, no junior claim or interest holder may receive any property under the plan on account of such junior claim or interest.[15] "Creditors are generally free to do whatever they wish with the bankruptcy dividends they receive, including sharing them with other creditors, so long as recoveries received under the Plan by other creditors are not impacted."[16] This concept is referred to as the gifting doctrine, which is permitted in some instances and prohibited in others. Vertical class gifting happens when a senior class directs funds to a junior class over another superior class's objection and is generally impermissible.[17] For vertical class skipping to be impermissible, the junior receiving class must be receiving value "under the plan" and the value given must be given "on account of" its junior claim or interest.[18]

However, the absolute priority rule may be set aside if the intermediate class between the senior and junior class consents to the plan.[19] If the classes consent to a plan and the plan is subsequently confirmed, then the parties will be limited in their ability to later raise a claim under the absolute priority rule.[20] There are narrow exceptions for when a party may challenge or modify a chapter 11 plan after confirmation, particularly under Bankruptcy Code sections 1127 and 1141. Upon

---

[13] Tr. Aug. 5, 2025 hearing, 10:24-11:5 [D.I. 149].
[14] Ad Hoc Group's Proposed Plan Language, Ad Hoc Group's Statement, Ex. A.
[15] 11 U.S.C. § 1129(b)(2)(B).
[16] In re Worldcom Inc., 2003 WL 23861928, *61 (S.D. N.Y. 2003).
[17] In re Nuverra Envtl. Sols., No. 17-1024-RGA, at *7 (D. Del. Aug. 3, 2017).
[18] Id.
[19] See Dish Network Corp. v. DBSD N. Am., Inc. (In re DBSD N. Am., Inc.), 634 F.3d 79, 100-01 (2d Cir. 2011).
[20] See Zardinovsky v. Arctic Glacier Income Fund (In re Arctic Glacier Int'l, Inc.), 901 F.3d 162, 166 (3d Cir. 2018) (finding that when a bankruptcy court enters a confirmation order, it renders a final judgment and that judgement, like other judgments, is res judicata and it "bars all challenges to the plan that could have been raised").

plan confirmation, creditors are precluded from asserting claims except to the extent and in the manner approved in the reorganization plan.[21] Section 1141(a) provides:

> [T]he provisions of a confirmed plan bind the debtor, any entity issuing securities under the plan, any entity acquiring property under the plan, and any creditor, equity security holder, or general partner in the debtor, whether or not the claim or interest of such creditor, equity security holder, or general partner is impaired under the plan and whether or not such creditor, equity security holder, or general partner has accepted the plan.[22]

Moreover, section 1141(c) states that "except as provided in the plan or in the order confirming the plan, after confirmation of the plan, the property dealt with by the plan is free and clear of all claims and interests of creditors, equity security holders, and of general partners in the debtor."[23]

Section 1141(c) must cover liens and must, therefore, means that unless the plan provides that a lien is preserved, it is extinguished by the confirmation, provided the holder of the lien participated in the case.[24] Should a party attempt to amend its claim, post confirmation, there is a required heightened showing because a confirmed plan of reorganization is equivalent to a final judgment in civil litigation.[25] As a binding final order, "a confirmation order prohibits those parties bound under § 1141(a) or their privies from relitigating any matter that was or could have been raised at confirmation."[26]

Under the Plan and the UCC Settlement Agreement, members of Class 8 will receive funds ahead of Class 7. Under the UCC Settlement Agreement, Class 8 is receiving funds from the secured creditors and the committee's professionals in exchange for its members' cooperation with the bankruptcy proceedings and the process of confirming the Plan, making this a gift from the secured creditors and the committee's professionals to Class 8 ahead of Class 7.[27]

---

[21] Gottlieb v. Kest, 141 Cal. App. 4th 110, 116, 46 Cal. Rptr. 3d 7, 11 (2006).
[22] 11 U.S.C. § 1141(a).
[23] 11 U.S.C. § 1141(c).
[24] In re Penrod, 50 F.3d 459, 563 (7th Cir. 1995).
[25] Clo Holdco, Ltd. v. Kirschner (In re Highland Capital Mgmt. LP), 102 F.4th 286, 291 (5th Cir. 2024).
[26] In re WorldCom, Inc., 401 B.R. 637, 648 (Bankr. S.D.N.Y. 2009); see CIRCLE K Corp. v. CIRCLE K Corp, 181 B.R. 457, 462.
[27] In re Nuverra Envtl. Sols. at *7.

Class 7, which represents Aves' interest, voted to accept the Plan. In so doing, Aves consented to its treatment under the Plan. Because of this consent, the absolute priority rule no longer applies as to the matter of Seller Noteholders receiving funds ahead of a more senior class.[28]

In the Plan, Aves had the right to file a claim within 14 days of the Escrow Account being funded. But Aves did not retain the right to contest plan provisions that it voted to accept and that are binding upon it. Under the Plan, "[n]o later than fourteen (14) days after the funding of the Escrow [Account], Aves may file with the Court a statement of claim as to that portion of the escrow to which Aves believes it is entitled."[29]

Following section 1141(a), I find that the terms of this confirmed plan thus bind Aves, regardless of whether the Plan has impaired a potential interest of Aves.[30] Aves, after all, consented to this treatment. Section 1141(c) further protects the funds in the Escrow Account against this claim because the property dealt with in this account is free and clear of all claims and interests of creditors, except as provided for in the Plan, and the Plan did not create a carve out for this specific interest.

Because Aves consented to its treatment under the Plan, and the order approving the Plan is a final non-appealable order, Aves' arguments under the absolute priority rule are misplaced..

In their response to Aves, the Seller Noteholders argued that subordination rights require an active default by the Debtors. However, I find that the Plan cured each of the defaults, releasing the Debtors from liability, and canceling the debt instruments.[31]

Bankruptcy Code section 510(a) provides, in part, that "a subordination agreement is enforceable in a case under [Title 11] to the same extent that such agreement is enforceable under applicable nonbankruptcy law."[32] Courts have found that section 510(a) "broadly allows for enforcement of subordination agreements."[33] Where "a plan of reorganization does nothing more than enforce the unambiguous terms of [a] contractual subordination agreement[] in accordance with section 510(a) of the [Bankruptcy] Code," such plan provisions are valid.[34] Furthermore, the Court "should interpret the Code in a manner that avoids a conflict between its

---

[28] See In re DBSD N. Am., Inc. at 100-01.
[29] Second Amended Joint Chapter 11 Plan, pp. 33.
[30] 11 U.S.C. § 1141(a).
[31] Certain Seller Noteholders Response to Ad Hoc Group of Mezz Lenders' Notice of Statement of Claim, Case No. 24-11188, D.I. 847.
[32] 11 U.S.C. § 510(a).
[33] Rosenfeld v. Coastal Broad. Sys., Inc. (In re Coastal Broad. Sys., Inc.), 2013 U.S. Dist. LEXIS 91469, *22.
[34] In re Best Prod. Co., Inc., 168 B.R. 35, 70 (Bankr. S.D.N.Y. 1994).

various sections" when deciding whether a subordination agreement conflicts with nonbankruptcy law.[35]

Paragraph 8(d)(i) of the Seller Note creates a prohibition against the receipt of a "subordinated payment." A "subordinated payment" is defined as a payment, directly or indirectly, by or on behalf of the Buyer Parties on account of the principal or interest of the subordinated debt at any time outstanding until the default or event of default is cured or waived to the satisfaction of the applicable lenders.[36] To be a subordinated payment, (i) the payment must come by, or on behalf of, the "Buyer Parties" (Optio Rx) and (ii) the default or event of default must have been cured or waived to the satisfaction of Aves.

As previously discussed, the distribution of funds to Class 8 is a permissible gift by the secured creditors and the committee's professionals. The payment is not coming from Optio Rx directly, but instead from the secured creditors and the committee's professionals. Thus, the first prong required to make a payment a subordinated payment cannot be satisfied. As for the second prong, Aves agreed to waive its default against Optio Rx in the Settlement Agreement when it received benefits in exchange for its support in confirmation of the Plan.[37] Section 7.03 of the Plan provides that the Debtors are released and discharged by each releasing party, which includes Aves, from all causes of action.[38] This further supports that Debtors are no longer in default to Aves. Aves, therefore, is unable to establish a claim under Paragraph 8(d)(i) of the Seller Note.

Upon consideration of Paragraphs 8(d)(ii) and 8(d)(iii) of the Seller Note, I find the language is different from that of Paragraph 8(d)(i), but a similar analysis may be applied, finding that this distribution of assets is not a payment of the "Buyer Parties" but a consented-to gift from secured creditors and the committees' professionals.

Because the Aves debt is no longer in default in accordance with the Plan and the distribution to the Seller Noteholders is not of the type governed by the subordination agreement in the Seller Note, I find Aves' arguments regarding the subordination agreement unpersuasive.

---

[35] In re Coastal Broad. Sys., Inc. at *22 (citing In re Dow Corning Corp., 255 B.R. 445, 478 (E.D. Mich. 2000)).
[36] Baybridge Seller Note, pp. 14-15.
[37] Aves Settlement Agreement, pp. 216.
[38] Second Amended Joint Chapter 11 Plan, pp. 48.

Therefore, Aves' claim is denied, and the disputed portion of the Escrow Account in the amount of $165,000 shall be paid to the Seller Noteholders.

*Thomas M. Horan* (signature)

_____
Thomas M. Horan
United States Bankruptcy Judge